Filed 8/28/19

CERTIFIED <u>FOR</u> <u>PARTIAL</u> <u>PUBLICATION</u>*

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Placer)

----

| | |
|---|---|
| GREGORY M. MOORE, | C082231 |
| Plaintiff and Appellant, | (Super. Ct. No. SCV0031530) |
| v. | |
| WELLS FARGO BANK, N.A., | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Placer County, Mark S. Curry, Judge. Reversed.

C. Athena Roussos for Plaintiff and Appellant.

Anglin Flewelling Rasmussen Campbell & Trytten, Robert A. Bailey and D. Dennis La, for Defendant and Respondent.

---

* Pursuant to California Rules of Court, rules 8.1105 and 8.1110, this opinion is certified for publication with the exception of parts II, III, IV, and V of the Discussion.

1

"As authorized by Congress, the United States Department of the Treasury implemented the Home Affordable Mortgage Program (HAMP) to help homeowners avoid foreclosure during the housing market crisis of 2008. 'The goal of HAMP is to provide relief to borrowers who have defaulted on their mortgage payments or who are likely to default by reducing mortgage payments to sustainable levels, without discharging any of the underlying debt.' " (*West v. JPMorgan Chase Bank, N.A.* (2013) 214 Cal.App.4th 780, 785.)

In this case, plaintiff Gregory Moore contacted defendant Wells Fargo, N.A. (Wells Fargo)[1] to discuss possible assistance programs while he was unemployed. Wells Fargo recommended the forbearance plan (Plan) under the Home Affordable Unemployment Program (Unemployment Program) outlined in the United States Department of the Treasury's HAMP supplemental directive 10-04 dated May 11, 2010 (Directive 10-04). Wells Fargo explained the Plan would allow Moore to make reduced monthly payments for a period of time and said there was "no downside" to the Plan -- if Moore qualified for a permanent loan modification at the conclusion of the Plan, the arrears would be added to the modified loan balance and, if Moore did not qualify for a permanent loan modification, he would return to making his normal monthly payments.

Moore applied for and was accepted to participate in the Plan. When he received the approval letter, entitled Unemployment Program Forbearance Plan Notice (Notice), Moore confirmed the Notice said the reduced monthly payments would be made "in

---

[1] Although it is unclear, it appears that some or all of the transactions at issue in this litigation involved Wachovia Bank, which was merged into Wells Fargo. (See *DeLeon v. Wells Fargo Bank, N.A.* (N.D.Cal. 2010) 729 F.Supp.2d 1119, 1121 ["World Savings had changed its name to Wachovia Mortgage, FSB and then merged into Wells Fargo Bank, N.A."].) The trial court's pertinent rulings pertain only to Wells Fargo and Wells Fargo does not dispute that it is the proper defendant to defend against Moore's allegations asserted herein.

place of" and "instead of" his normal monthly payments. Moore made the Plan payments and later applied for a permanent loan modification.

Three days after receiving a denial of his permanent loan modifiction application, Moore received a letter from Wells Fargo stating he was in default on his loan, demanding immediate payment of his normal mortgage payment and the arrears consisting principally of the difference between his normal mortgage payments and the reduced Plan payments (i.e., a balloon payment), and threatening foreclosure. Moore sued to stop the foreclosure and asserted the following causes of action: (1) declaratory relief; (2) negligence; (3) breach of the covenant of good faith and fair dealing; (4) fraud; and (5) violation of Business and Professions Code section 17200, the unfair competition law.[2]

In pretrial rulings, the trial court, among other things, adjudicated Moore's declaratory relief cause of action in favor of Wells Fargo's contractual interpretation permitting it to demand the balloon payment and dismissed Moore's negligence cause of action in response to Wells Fargo's motion for judgment on the pleadings. The case then proceeded to a jury trial.

After Moore rested his case at trial, the trial court granted Wells Fargo's motion for nonsuit as to Moore's breach of the implied covenant of good faith and fair dealing cause of action. The trial court further granted Wells Fargo's motion for judgment notwithstanding the verdict after the jury found Wells Fargo had committed fraud. The trial court also adjudicated the unfair competition law cause of action posttrial, finding in favor of Wells Fargo, and granted Wells Fargo's motion for costs and attorney fees.

---

[2]      Plaintiff filed an authorized amendment to the third amended complaint. The amendment was not provided in the appellate record, and Moore asserts it is irrelevant to the issues on appeal.

3

On appeal, Moore challenges the foregoing pretrial and posttrial rulings. We reverse.

THE GENERAL ALLEGATIONS

We provide a summary of the pertinent general allegations in the third amended complaint here as background and include the detailed factual background pertaining to each issue (including the trial evidence) in the applicable portion of the Discussion.

Moore purchased his home in 1995 with a home loan by World Savings & Loan; he refinanced the loan with the same lender in 2004. World Savings & Loan was subsequently acquired by or merged with Wachovia Bank, which, in turn, was later acquired by or merged with Wells Fargo.

In or about April 2009, Moore lost his job. Moore argued he continued making his full mortgage payments through October 2010.[3] In or about October 2010, anticipating difficulty in continuing to make full mortgage payments, Moore called Wells Fargo to discuss recommendations for financial relief until he became reemployed.

A Wells Fargo representative described and recommended the Plan under HAMP's Unemployment Program. Moore provided the necessary financial and personal information, and, in approximately October 2010, Moore received an approval letter from Wells Fargo outlining the terms and conditions of the Plan. Under the Plan, Moore's monthly payments were reduced from approximately $2,500 to $599.42. Moore "did not undertake alternative financial remedies he could have pursued including but not limited to: the seeking of alternative sources of financing; increasing his income with the taking-on of renters; the listing and sale of his residence; or filing for bankruptcy, because of the representations made to him by [Wells Fargo] about the Plan."

---

[3] At oral argument, the parties agreed Moore did not make the September payment and was technically in default.

During phone calls with Wells Fargo, Moore inquired into the likely benefits or liabilities upon completion of the Plan. Based on those conversations, Moore "understood that if he remained in compliance with the Plan requirements, he would likely be approved for a modified loan upon completion of the Plan. At no time [when he applied for the Plan or] during [the monthly] phone calls or in any discussion with any [Wells Fargo] employee prior to March 2, 2011 was [Moore] advised that he would be responsible for immediate repayment of the difference between the Plan's forbearance payments and the financially greater, pre-forbearance mortgage payments, i.e. a 'balloon' payment." Moore also received no written notice regarding the balloon payment requirement. Rather, in response to his inquiries, Wells Fargo repeatedly assured Moore that he would not incur any additional liabilities under the Plan.

Moore made the six Plan payments and three agreed-upon additional payments through extension of the Plan. In August 2011, however, Wells Fargo refused to accept another reduced Plan payment and advised Moore he was liable for immediate payment of his normal full mortgage payment and the arrears of $19,000, consisting of the difference between his full mortgage payments and the reduced Plan payments plus fees and penalties. Wells Fargo considered Moore's Plan payments to constitute a default under the loan, and had reported the Plan payments as such to the credit reporting bureaus.

Moore advised Wells Fargo that payment of the $19,000 would constitute a financial hardship; Wells Fargo responded his failure to pay the amount would result in commencement of foreclosure proceedings. It further said any payment made "would be applied to the payment most in 'arrears', namely the payment due November, 2010, the month in which the Plan had begun." Moore received a notice of default and election to sell in March 2012, and a notice of sale in June 2012.

Moore filed suit to avoid the foreclosure and asserted various causes of action. The trial court issued a restraining order precluding a trustee sale during the pendency of the litigation.

DISCUSSION

I

*Contract Claims*

Moore's contract-based claims -- as set forth in his declaratory relief and breach of the implied covenant of good faith and fair dealing causes of action -- are grounded in the premise that the Notice modified the loan's deed of trust and note; a premise not challenged or disputed by Wells Fargo. Indeed, Wells Fargo agrees the Notice must be read in conjunction with the deed of trust and note to understand the parties' respective rights, duties, and obligations, and asserted in the trial court that the Notice modified the note and deed of trust. The Notice, deed of trust, and note are collectively referred to as contract documents.

The principal dispute between the parties is whether Wells Fargo could, pursuant to the contract documents, deem Moore in default and, accordingly, demand a balloon payment at the end of the Plan term, as it did. The trial court found the terms of the contract documents unambiguous in favor of Wells Fargo's interpretation.

The trial court's ruling on the threshold question of ambiguity "is a question of law subject to our independent review." (*Curry v. Moody* (1995) 40 Cal.App.4th 1547, 1552.) We do not read the contract documents the same way as the trial court; we find them ambiguous.

A

*Contract Interpretation Principles Generally*

"A modification of a contract is a change in the obligations of a party by a subsequent mutual agreement of the parties." (*West v. JPMorgan Chase Bank, N.A.*, *supra*, 214 Cal.App.4th at p. 798.) The language in the contract, as modified, must be

6

interpreted as a whole and in the circumstances of the case; it cannot be found ambiguous in the abstract. (*Producers Dairy Delivery Co. v. Sentry Ins.* (1986) 41 Cal.3d 903, 916, fn. 7.) "The proper interpretation of a contract is disputable if the contract is susceptible of more than one reasonable interpretation, that is, if the contract is ambiguous. An ambiguity may appear on the face of a contract, or extrinsic evidence may reveal a latent ambiguity." (*Fremont Indemnity Co. v. Fremont General Corp.* (2007) 148 Cal.App.4th 97, 114.) As our Supreme Court made clear in *Pacific Gas & E. Co.*, however, "[a] court cannot determine based on only the four corners of a document, without provisionally considering any extrinsic evidence offered by the parties, that the meaning of the document is clear and unambiguous." (*Fremont Indemnity Co.*, at p. 114 [discussing *Pacific Gas & E. Co. v. G. W. Thomas Drayage etc. Co.* (1968) 69 Cal.2d 33, 37].)

"[W]here the terms of an agreement are ambiguous, they 'should be interpreted most strongly against the party who caused the uncertainty to exist.' [Citation.] Finally, 'when different constructions of a provision are otherwise equally proper, [the construction] to be taken [is the one] most favorable to the party in whose favor the provision was made.' " (*Sutherland v. Barclays American/Mortgage Corp.* (1997) 53 Cal.App.4th 299, 310 (*Sutherland*).)

B

*Contract Documents*

1

*The Note*

The note provides Moore agreed to make principal and interest payments on the 15th day of every month from October 15, 2004, through September 15, 2034, to repay the $310,000 principal at a variable interest rate. Any amount remaining on September 15, 2034, would be paid in full on that date -- the maturity date. If Moore's "monthly payments [were] insufficient to pay the total amount of monthly interest that [wa]s due[,] . . . the amount of interest that [wa]s not paid each month, called 'Deferred

7

interest,' w[ould] be added to [his] Principal and w[ould] accrue interest at the same rate as the Principal." In the event the unpaid balance exceeded 125 percent of the principal originally borrowed, Moore's monthly payment would be recalculated such that Moore "w[ould] pay a new monthly payment which [wa]s equal to an amount that w[ould] be sufficient to repay [his] then unpaid balance in full on the Maturity Date at the interest rate then in effect, in substantially equal payments."

Pertinent to the issue at hand, Moore would be in default if "[he] d[id] not pay the full amount of each monthly payment on the date it [wa]s due." In that case, "the Lender [could] send [him] a written notice, called 'Notice of Default,' telling [him] that if [he] d[id] not pay the overdue amount by a certain date, the Lender [could] require [him] to pay immediately the amount of Principal which ha[d] not been paid and all the interest that [he] owe[d] on that amount, plus any other amounts due under the Security Instrument." The lender's decision not to require Moore to pay immediately the full amount owed at the time of default would not preclude the lender from "do[ing] so if [Moore] [was] in default at a later time."

The note further states the "the Security Instrument dated the same date as th[e] Note g[ave] the Lender security against which it [could] proceed if [Moore] d[id] not keep the promises which [he] made in th[e] Note."

2

*The Deed Of Trust*

The deed of trust secured the note for the maximum aggregate principal balance of $387,500 -- 125 percent of the original principal note amount. It contains two provisions outlining the lender's rights in the event of default. The first provision is entitled "Lender's Rights" and states: "Even if Lender does not exercise or enforce any of its rights under this Security Instrument or under the law, Lender will still have all of those rights and may exercise and enforce them in the future. Even if Lender obtains insurance, pays taxes, or pays other claims, charges or liens against the Property, Lender

will have the right under Paragraph 28 below to demand that [Moore] make immediate payment in full of the amounts that [Moore] owe[s] to Lender under the Secured Notes and under this Security Instrument."

The second provision is contained in paragraph 28, entitled "Rights of the Lender if There is a Breach of Duty." That provision states that, if Moore breached his duty by failing to, among other things, "pay the full amount of each monthly payment on the date it [wa]s due," the "Lender [could] demand an immediate payment of all sums secured . . . [and] [¶] . . . [could] take action to have the Property sold under any applicable law. [¶] Lender [would] not have to give [him] notice of a Breach of Duty. If Lender d[id] not make a demand for full payment upon a Breach of Duty, Lender [could] make a demand for full payment upon any other Breach of Duty."

3

*The Notice*

The Notice was dated October 8, 2010. It states, in pertinent part:

"After carefully reviewing the information you have provided, you are approved to enter into a forbearance plan under the Home Affordable Unemployment Program. Please read this letter so that you understand the terms and conditions of the forbearance plan (the 'Plan').

"What_you_need_to_do . . .

"You must make the new monthly 'forbearance plan payments' in place of your normal monthly mortgage payment. Send your monthly forbearance plan payments - instead of your normal monthly mortgage payment - as follows: [six payments of $599.42 each to be made on the first day of each month starting on November 1, 2010, and ending April 1, 2011]

"[¶] . . . [¶]

9

"While you are performing under the terms of this Plan, your home will not be referred to foreclosure or sold at a foreclosure sale, if allowed by state law and/or investor guidelines.

"This Plan will be terminated, regardless of payments received, if the Borrower fails to submit timely, complete documentation as required by the Home Affordable Program(s) or by lender.

"The lender is under no obligation to enter into any further agreement, and this Plan shall not constitute a waiver of the lender's right to insist upon strict performance in the future.

"All of the provisions of the note and security instrument, except as herein provided, shall remain in full force and effect.  Any breach of any provision of this Plan or non-compliance with this Plan, shall render the forbearance null and void, and at the option of the lender, without further notice to you, may terminate this Plan.  The lender, at its option, may institute foreclosure proceedings according to the terms of the note and security instrument without regard to this Plan.  In the event of foreclosure, you may incur additional expenses of attorney's fees and foreclosure costs.

"The due date of your loan will continue to be reported to the credit bureaus on a monthly basis."

## C

### *The Contract Causes Of Action*

#### 1

### *Declaratory Relief*

In his declaratory relief cause of action, Moore alleged an actual controversy existed regarding the parties' "respective rights and duties under the applicable promissory note and deed of trust, as modified by the Plan," because Moore *had not missed a loan payment and was not in default*.

Moore sought a judicial determination of his rights and duties, and declarations that the Notice was a binding contract; Wells Fargo was precluded from seeking the balloon payment "both by the express terms of the Plan and by [its] failure to disclose that additional terms were in effect" and because it "failed to provide [Moore] with other loss mitigation options"; Moore was not actually in default on his loan; the pending foreclosure proceedings were invalid; and Wells Fargo's refusal to accept Moore's tendered payment excused him from his payment obligation and precluded the accrual of interest and late charges.

2

*Breach Of The Implied Covenant Of Good Faith And Fair Dealing*

To frame Moore's breach of implied covenant allegations, we begin with a brief background of the law. The implied covenant of good faith and fair dealing is implied by law in every contract to prevent a contracting party from depriving the other party of the benefits of the contract. Thus, " ' "[e]very contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement." ' " (*Carma Developers (Cal.), Inc. v. Marathon Development California, Inc.* (1992) 2 Cal.4th 342, 371.) The failure to deal fairly or in good faith gives rise to an action for damages. (See *Sutherland*, *supra*, 53 Cal.App.4th at p. 314.) "The covenant of good faith finds particular application in situations where one party is invested with a discretionary power affecting the rights of another." (*Carma Developers (Cal.), Inc.*, at p. 372.)

"It is universally recognized the scope of conduct prohibited by the covenant of good faith is circumscribed by the purposes and express terms of the contract." (*Carma Developers (Cal.), Inc. v. Marathon Development California, Inc.*, *supra*, 2 Cal.4th at p. 373.) Violation of an express provision is not, however, required. (*Ibid.*) "Nor is it necessary that the party's conduct be dishonest. Dishonesty presupposes subjective immorality; the covenant of good faith can be breached for objectively unreasonable conduct, regardless of the actor's motive." (*Ibid.*) "A party violates the covenant if it

11

subjectively lacks belief in the validity of its act or if its conduct is objectively unreasonable. [Citations.] In the case of a discretionary power, it has been suggested the covenant requires the party holding such power to exercise it 'for any purpose within the reasonable contemplation of the parties at the time of formation -- to capture opportunities that were preserved upon entering the contract, interpreted objectively.' " (*Id.* at p. 372.)

"The issue of whether the implied covenant of good faith and fair dealing has been breached is ordinarily 'a question of fact unless only one inference [can] be drawn from the evidence.' " (*Hicks v. E. T. Legg & Associates* (2001) 89 Cal.App.4th 496, 509.)

Moore alleged an implied covenant of good faith and fair dealing was included in the Notice, precluding Wells Fargo from depriving Moore of the benefits of the agreement. He alleged the Plan was entered into pursuant to the HAMP guidelines and Wells Fargo was impliedly required to comply with the guidelines, including: notice, minimum duration of the forbearance period, extension and termination, and offering loss mitigation options upon expiration of the Plan.

Moore alleged Wells Fargo breached the implied covenant by, among other things: "misle[ading] [him] regarding the terms of the Plan and extensions thereof, including leading [him] to believe that the Plan payments constituted full payments of his loan as implied by the Plan agreement as opposed to partial and incomplete payments, resulting in arrearages and default, and that the Plan would protect [him] from the foreclosure of the Property"; failing to provide notice of Moore's duty to pay the balloon payment despite his inquiries "as to any additional liabilities he might incur relative to the Plan contract"; purposely limiting the training of its agents; and failing to comply with the HAMP guidelines regarding the minimum Plan forbearance period of 12 months, various notice requirements, and criteria for considering a HAMP application.

As a result of this alleged breach of the implied covenant, Moore was damaged in an amount to be shown according to proof.

12

# D

## *The Trial Court Arguments And Rulings*

### 1

### *Declaratory Relief*

On the first day of trial, prior to jury selection, the trial court asked the parties to argue their respective positions relating to the interpretation of the contract documents. The trial court explained it would exercise its power in equity by examining the contract documents to determine whether there was a contract and what the provisions or conditions of the contract were. If the trial court found no meeting of the minds or that the contract terms were ambiguous, the court would permit the introduction of extrinsic evidence at trial to avoid duplication of testimony.

Moore argued the contract was ambiguous because the Notice required him to make the reduced payments "in place of" the normal payments and there was no indication that his payment of the reduced amounts would result in a default on the loan or trigger a balloon payment obligation at the end of the Plan term. Wells Fargo argued the term forbearance means the giving of further time to pay a debt or an agreement not to enforce a claim when it is due. It further argued the Notice had to be read in conjunction with the note, because it modified the note. Various note provisions, it argued, expressly vested Wells Fargo with the authority to deem Moore in default and to demand a balloon payment; Wells Fargo did not waive any rights under the note in the Notice.

The trial court issued a written ruling on October 26, 2015. Initially, the trial court expressed doubt as to whether the Notice qualified as a contract modification due to the lack of consideration; however, the court did not ultimately rule on the issue and presumed the existence of a valid modification.

The trial court considered Moore's offer of proof as to the extrinsic evidence he would introduce relating to the ambiguity in the contract terms, but concluded the

13

proffered parol evidence was unnecessary because it "d[id] not aid in the interpretation of [the] contractual obligations of the parties in this case" given "[t]he issue in this case is not ambiguous terms in the Plan, but rather the absence of specificity or terms in the Plan." The court explained "[i]t is well settled that extrinsic evidence cannot be used to add a provision to the contract that was omitted by the parties."

The court framed the issue as "whether this [Notice] was meant to modify the terms of the note such that the defendant was willing to forgive or waive the full amounts due for each month during the forbearance period or whether the Plan merely permitted reduced monthly payments, but the plaintiff was still otherwise contractually obligated to become fully current when the plan terminated." The court concluded "the later [*sic*] is a more reasonable interpretation given the nature of a forbearance. A forbearance occurs when the creditor, in exchange for consideration, agrees to wait for a period of time to collect the debt. It is the giving of further time for the payment of a debt. [Citation.] A forbearance is *not* the modification of the loan terms or the forgiveness of debt. There is nothing in the written terms of this [Notice] providing that the defendant was willing to waive, forgive, or agree to otherwise amortize back into the principal the past due full amounts. . . . [¶] While it is true the [Notice] received by the plaintiff [did] not explain how the shortage would be considered, neither did it contain a promise by the defendant to waive or [forgive the debt]." The trial court further noted Moore had a duty to make a reasonable inquiry regarding the terms and was bound by the terms of the deed of trust and the note even if he did not read them.

The trial court disagreed with Moore's argument that the HAMP guidelines set forth in Directive 10-04 were incorporated into the terms of the Notice. The court explained "th[o]se directives are actually part of a contractual agreement between the Federal government and servicers" and Moore "has no private right of action . . . to enforce HAMP guidelines [because it] is not a third party beneficiary to HAMP contracts."

14

The trial court interpreted the rights and obligations of the parties as follows:

"That when the plaintiff began making reduced payments in accordance with the Plan notice, the defendant could not declare the plaintiff in default or commence foreclosure proceedings if payment and notice requirements were met;

"That the [plaintiff] could not be charged late fees or other charges related to a delinquency during the time the plaintiff was making reduced payments under the plan;

"That the defendant could unilaterally terminate the plan at any time;

"That upon termination of the plan by the defendant, the plaintiff was obligated to become fully current by paying the full amounts then due under the terms of the note and deed of trust;

"That upon termination of the plan, if the plaintiff did not become fully current under the terms of the note and deed of trust, it would constitute a breach of contract and the defendant could commence foreclosure proceedings in accordance with the terms of the note and/or deed of trust."

2

*Breach Of The Implied Covenant Of Good Faith And Fair Dealing*

After Moore rested his case at trial, Wells Fargo verbally moved for nonsuit on the breach of the implied covenant cause of action. " 'A nonsuit in a jury case or a directed verdict may be granted only when disregarding conflicting evidence, giving to the plaintiffs' evidence all the value to which it is legally entitled, and indulging every legitimate inference which may be drawn from the evidence in plaintiffs' favor, it can be said that there is no evidence to support a jury verdict in their favor. [Citations.]' [Citation.] Nonsuit is appropriate where the plaintiff's proof raises nothing more than speculation, suspicion or conjecture." (*Hernandez v. Amcord, Inc.* (2013) 215 Cal.App.4th 659, 669.)

Wells Fargo argued nonsuit was appropriate because Moore did not demonstrate his compliance with the contract terms, did not show a breach by Wells Fargo (either

15

because the trial court had already found the basis for the claim preempted or it would impose an obligation different from the express terms of the contract as interpreted by the trial court), and Moore did not prove any damages resulting from such breach. Moore responded Wells Fargo had waived any noncompliance by Moore when it agreed to extend the Plan period and the balloon payment, among other things, constituted damages because it was a debt not otherwise owed by Moore in the absence of Wells Fargo's breach. Wells Fargo disagreed the balloon payment could constitute damages because: (1) Moore had not yet paid the balloon payment; and (2) the trial court already ruled Wells Fargo was expressly permitted by contract to demand the balloon payment.

The trial court granted nonsuit, finding "there ha[d] been no evidence of a breach of contract in light of the Court's interpretation of the contract" and "no evidence as a matter of law as to appropriate damages."

We review the trial court's nonsuit ruling de novo, resolving all presumptions, inferences and doubts in favor of the plaintiff. (*Hernandez v. Amcord, Inc.*, *supra*, 215 Cal.App.4th at p. 669.)

E

*The Contract Interpretation Issue Is Not Moot*

Wells Fargo argues the nonjudicial foreclosure of Moore's property after trial rendered Moore's appeal of the declaratory relief ruling moot because the foreclosure "terminated the contractual relationship between him and Wells Fargo" leaving no present or ongoing controversy for our determination.[4] It is true, as Wells Fargo urges, declaratory relief operates prospectively and there is no basis for declaratory relief where only past wrongs are involved. (*Baldwin v. Marina City Properties, Inc.* (1978) 79 Cal.App.3d 393, 407.) " 'It necessarily follows that when, pending an appeal from the

---

[4]     Moore does not address the argument.

judgment of a lower court, and without any fault of the defendant, an event occurs which renders it impossible for this court, if it should decide the case in favor of plaintiff, to grant him any effectual relief whatever, the court will not proceed to a formal judgment, but will dismiss the appeal.' " (*Consol. etc. Corp. v. United A. etc. Workers* (1946) 27 Cal.2d 859, 863.)

"The general rule regarding mootness, however, is tempered by the court's discretionary authority to decide moot issues. When an action involves a matter of continuing public interest that is likely to recur, a court may exercise an inherent discretion to resolve that issue, even if an event occurring during the pendency of the appeal normally would render the matter moot. [Citations.] Another exception exists when, despite the happening of a subsequent event, material questions remain for the court's determination. [Citations.] This exception has been applied to declaratory relief actions on the basis that the court must do complete justice once jurisdiction has been assumed." (*Building a Better Redondo, Inc. v. City of Redondo Beach* (2012) 203 Cal.App.4th 852, 867.) "[T]he relief thus granted may encompass future and contingent legal rights." (*Eye Dog Foundation v. State Board of Guide Dogs for the Blind* (1967) 67 Cal.2d 536, 541.)

Here, the foreclosure did not occur without any fault of the defendant; indeed, Wells Fargo affirmatively took steps to complete the nonjudicial foreclosure following trial. More importantly, even though the foreclosure may have mooted any prospective declaration with respect to the contractual relationship between the parties, a material question remains for our determination. We must reach the merits of the trial court's contract interpretation ruling because it materially impacts the trial court's ruling on the breach of the implied covenant cause of action -- to which Wells Fargo correctly does not raise a mootness challenge. The foreclosure did not render impossible our ability to grant Moore effectual relief on his contract interpretation claim. Accordingly, we reach the merits of the trial court's contract interpretation ruling.

F

*The Terms Of The Contract Documents Are Ambiguous*

The question before us is whether the contract documents (as modified by the Notice) interpreted together are reasonably susceptible to the interpretations urged by Wells Fargo -- that it could deem Moore in default and demand a balloon payment at the end of the Plan term -- and Moore -- that the Notice "provided that Wells Fargo would accept reduced payments during the [Plan] period, modifying the loan requiring larger payments" such that Wells Fargo "had no basis to put Moore in default, report his deficiency to credit agencies, or demand that Moore make a balloon payment at the end of the period."

As previously indicated, our review as to ambiguity is independent of the trial court's decision. We conclude the contract documents are susceptible to each party's interpretation, rendering the language ambiguous.

The note defines default as the failure to pay the full amount of each monthly payment on the date it is due and the deed of trust defines breach of duty as the same. It was the default and breach of duty provisions in the note and deed of trust that provided Wells Fargo with the right to demand a balloon payment and to deem Moore in default of the loan agreement. The Notice stated it was a forbearance agreement (without defining that term) and required Moore to "make the new monthly 'forbearance plan payments' *in place of* [his] normal monthly mortgage payment" on the first of each of the six months identified therein (as opposed to the 15th day of each month, as stated in the note). (Italics added.) The Notice further stated: "All of the provisions of the note and security instrument, except as herein provided, shall remain in full force and effect."

The language could be read, as the trial court found, that Moore's in-lieu payments under the Plan were merely forbearance payments in exchange for the promise not to foreclose on the property. That is that the payments "in place of" the normal monthly payment were not the "full amount of each monthly payment" under the terms of the note

18

and deed of trust but rather a payment for giving of further time to pay the debt and to not enforce the default when it was due. Under this interpretation, Moore would be in default for failing to pay the full amount of each monthly payment and the "no waiver" provision in the Notice would have preserved Wells Fargo's right to demand a balloon payment at the end of the Plan period as provided in the note.

The language is also reasonably susceptible to the interpretation that the new monthly reduced payments were the "full amount of each monthly payment" due on the first day of each of the six months identified in the Notice. The change in the payment amount and the due date would be the provisions "as herein provided" for purposes of the clause, "[a]ll of the provisions of the note and security instrument, except as herein provided, shall remain in full force and effect." Under this interpretation, if Moore paid the $599.42 each month as required in the Notice (and any extension thereof), Moore could not be deemed in default or in breach of duty because he was paying the "full amount of each monthly payment" required under the modified contract. It follows that, if Moore complied with the terms of the Notice, Wells Fargo could not demand a balloon payment for the difference between the regular and modified monthly payments at the end of the Plan term.

Moore's interpretation does not negate the "no waiver" language in the Notice. That provision is reasonably susceptible to the interpretation that Wells Fargo retained its rights to deem Moore in default and breach of duty for any reason stated in the note and deed of trust *after* the Plan term expired, and for any reason not modified in the Notice *during* the Plan term (e.g., if Moore made a misrepresentation on his loan application). Under such circumstances, while Wells Fargo could not deem Moore in default for failing to pay the difference between the regular and reduced monthly payments, it could deem Moore in default for several other reasons -- for example, if Moore had failed to timely pay the reduced monthly payments.

19

Moore's interpretation is also not inconsistent with the definition of forbearance. The existing note provisions would allow Moore additional time to pay the sum of the difference between the normal and reduced monthly payments either by allowing him until the end of the loan term to do so or by increasing his monthly loan payment in equal amounts at some point in the future to bring the amount owed below 125 percent of the principal at the beginning of the loan. Both scenarios are consistent with the concept of forbearance. Such an interpretation does not result in a partial forgiveness of the debt. It also does not constitute a restructuring of the loan because the interpretation is based on the existing terms of the loan agreement.

Moore's interpretation further does not lead to an impossibility. Wells Fargo argues "as a matter of simple arithmetic, it would not be possible for [Moore] to go back to his original payments if the arrearage was applied to the principal." Thus, Wells Fargo posits, "the proffered parol evidence that he would go back to his old payment does not support an interpretation that the arrearage would be put back on the principal." Wells Fargo fails to account, however, for the express provisions in the note providing any amount remaining on September 15, 2034, would be paid in full on that date and, if the balance exceeded 125 percent of the original principal, the monthly payment would be recalculated. Applying those provisions to Moore's interpretation, if Moore resumed his normal monthly payments following the expiration of the Plan term, the sum of the difference between the normal and reduced monthly payments would be due on or before September 15, 2034, or could lead to the recalculation of his monthly payment if the amount owed exceeded 125 percent of the original principal. Whether such an interpretation is reasonable under the circumstances is a decision left to the trier of fact.

This case bears similarities to *Sutherland*. In *Sutherland*, the plaintiff "owned a condominium that sustained severe damage in an earthquake. Sutherland contacted her mortgage company, explained what had happened, and stated that she had to move out of the damaged unit and rent another residence. The mortgage company agreed to put a

20

'stop' on her account for three months, during which time she did not have to make any payments.  Sutherland believed that the 'stop' period was intended to give her a financial break to deal with the unexpected costs of the earthquake.  She thought that, at the end of the three-month period, her mortgage payments would resume in the regular amounts, thereby extending the life of the mortgage by three months.  [¶]  A week before the end of the 'stop' period, [however,] the mortgage company informed Sutherland that her next scheduled payment had to include not only the regular monthly amount but also the sum of the three months' payments not made during the 'stop' period" -- i.e., a balloon payment.  (*Sutherland*, *supra*, 53 Cal.App.4th at pp. 303-304.)

Sutherland sued the mortgage company for, among other things, breach of oral contract.  (*Sutherland*, *supra*, 53 Cal.App.4th at p. 308.)  Barclays moved for summary judgment, which the trial court granted.  (*Id.* at p. 309.)  The Court of Appeal reversed. (*Id*. at p. 318.)

The Court of Appeal explained the circumstances surrounding the oral agreement supported Sutherland's position because Barclays should have understood that "if an earthquake victim needs immediate relief from her loan payments, it does little good to require that the excused payments be made three months later in a lump sum." (*Sutherland*, *supra*, 53 Cal.App.4th at p. 310.)  It further said:  "Even if we ignore the circumstances surrounding the parties' oral agreement, we cannot conclude that an agreement to 'stop' a loan account for three months means that, as a matter of law, the excused payments will all be due in the fourth month.  A mortgagee's statement that it will temporarily 'stop' an account does not indicate with reasonable certainty when the excused payments have to be made.  Such a statement is ambiguous and should arguably be construed in favor of the borrower.  [Citation.]  Moreover, to the extent the parties' competing interpretations of the 'stop' payment agreement are equally plausible, the agreement should be interpreted in favor of the borrower, since it was for her benefit that the agreement was made." (*Id*. at p. 311.)

21

The same is true here. Nothing in the Notice (or the note or deed of trust for that matter) indicates "with reasonable certainty when the [difference between the reduced and normal payments] ha[d] to be made." (*Sutherland*, *supra*, 53 Cal.App.4th at p. 311.) The contract documents are therefore ambiguous with respect to that term and should arguably be construed in favor of the borrower. (*Ibid.*)

Having found the language of the modified contract documents ambiguous, we reverse the trial court's ruling on the declaratory relief cause of action and remand the contract interpretation issue to the trial court for resolution by the trier of fact. In its analysis, the trier of fact shall consider the proffered extrinsic evidence of the parties' conduct before the controversy arose, including their communications before and after the contract modification. (*Universal Sales Corp. v. Cal. etc. Mfg. Co.* (1942) 20 Cal.2d 751, 761 ["[W]hen a contract is ambiguous, a construction given to it by the acts and conduct of the parties with knowledge of its terms, before any controversy has arisen as to its meaning, is entitled to great weight, and will, when reasonable, be adopted and enforced by the court"].)

We reverse the trial court's nonsuit ruling on the breach of the implied covenant cause of action for the same reason because it was based entirely on the trial court's interpretation of the contract documents. In essence, the trial court concluded Moore could not imply a covenant into the contract documents precluded by the express terms, as interpreted by the trial court. Indeed, the trial court found there had been no evidence of a breach of contract and no evidence of damages "as a matter of law" "in light of the Court's interpretation of the contract." The breach of the implied covenant cause of action can be resolved only after a trier of fact resolves the contract interpretation issue. The trier of fact must then determine whether Wells Fargo's actions (including its balloon payment demand) deprived Moore of the benefit of the modified contract documents.

22

## II

### *Negligence*

Moore appeals the trial court's finding that the Home Owners' Loan Act (HOLA) (12 U.S.C. § 1461 et seq.) preempted his negligence cause of action. The ruling was in response to Wells Fargo's motion for judgment on the pleadings. " 'A motion for judgment on the pleadings is equivalent to a demurrer and is governed by the same de novo standard of review.' [Citation.] 'All properly pleaded, material facts are deemed true, but not contentions, deductions, or conclusions of fact or law . . . .' " (*People ex rel. Harris v. Pac Anchor Transportation, Inc.* (2014) 59 Cal.4th 772, 777.) " '[W]e give the complaint a reasonable interpretation by reading it as a whole and all of its parts in their context. [Citations.] We are not concerned with a plaintiff's possible inability to prove the claims made in the complaint, the allegations of which are accepted as true and liberally construed with a view toward attaining substantial justice.' " (*Lovejoy v. AT&T Corp.* (2001) 92 Cal.App.4th 85, 91.) Extrinsic evidence is not properly presented on a motion for judgment on the pleadings. (*Burnett v. Chimney Sweep* (2004) 123 Cal.App.4th 1057, 1063.)

Like a demurrer, a motion for judgment on the pleadings "does not lie as to a portion of a cause of action, and if any part of a cause of action is properly pleaded, the [motion] will be overruled." (*Fire Ins. Exchange v. Superior Court* (2004) 116 Cal.App.4th 446, 452.) "We affirm the judgment if it is correct on any ground stated in the [motion], regardless of the trial court's stated reasons." (*Mexia v. Rinker Boat Co., Inc.* (2009) 174 Cal.App.4th 1297, 1303.)

Before we delve into the substance of the preemption issue, we note a couple of important parameters to the analysis that follows. First, we presume Moore states valid and cognizable elements for a negligence cause of action based on the allegations in the third amended complaint. We do so because Wells Fargo did not challenge the cause of action for failure to state a claim on any grounds other than HOLA preemption in its

23

motion for judgment on the pleadings.[5]  While we presume Moore states valid elements for negligence for purposes of this analysis, we do not decide that he does.  Second, the trial court's ruling on the motion applied to several other causes of action.  Moore appeals the ruling only with respect to the negligence cause of action.  Our analysis is therefore limited to that cause of action alone.

A

*Preemption Generally*

" 'The supremacy clause of the United States Constitution establishes a constitutional choice-of-law rule, makes federal law paramount, and vests Congress with the power to preempt state law.' " (*Quesada v. Herb Thyme Farms, Inc.* (2015) 62 Cal.4th 298, 307-308.)  Congress may expressly preempt state law through an explicit preemption clause, or courts may imply preemption under three doctrines:  (1) field preemption, when "Congress intended, by comprehensive legislation, to occupy the entire field of regulation, leaving no room for the states to supplement federal law"; (2) conflict preemption, "when compliance with both federal and state regulations is an impossibility"; or (3) obstacle preemption, "when state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.' " (*Bronco Wine Co. v. Jolly* (2004) 33 Cal.4th 943, 955.)

---

**5**      We are aware of the footnote in the trial court's ruling that states:  "Even if plaintiff's negligence claims are not preempted by Federal law, they may suffer from another fatal legal deficiency; the absence of a duty of care."  This notation does not constitute a ruling on the issue, as indicated by the use of "may" in the sentence.  More importantly, Wells Fargo did not raise a challenge to Moore's asserted duty of care in its motion.  We, therefore, do not address the parties' arguments as to whether Moore articulated a duty of care.  We decline, for the same reason, to address Wells Fargo's argument that Moore's negligence claim fails because he conceded the claim is based entirely on contractual duties.

Preemption may result, not only from action taken by Congress itself, but also from action by a federal agency. (*Louisiana Public Service Com. v. FCC* (1986) 476 U.S. 355, 369 [90 L.Ed.2d 369, 382]; *Quesada v. Herb Thyme Farms, Inc.*, *supra*, 62 Cal.4th at p. 308 ["federal agencies, acting pursuant to authorization from Congress, can issue regulations that override state requirements"].) "A regulation's preemptive effect 'does not depend on express congressional authorization to displace state law.' [Citation.] Instead, the determinative issues are whether (1) the agency intended its regulation to have a preemptive effect and (2) the agency acted within the scope of its congressionally delegated authority by issuing the preemptive regulation. [Citation.] So long as those conditions are met, '[f]ederal regulations have no less pre-emptive effect than federal statutes.' " (*Gibson v. World Savings & Loan Assn.* (2002) 103 Cal.App.4th 1291, 1297 (*Gibson*).)

"In determining whether federal law preempts state law, a court's task is to discern congressional [or federal agency] intent." (*Bronco Wine Co. v. Jolly*, *supra*, 33 Cal.4th at p. 955; *Quesada v. Herb Thyme Farms, Inc.*, *supra*, 62 Cal.4th at p. 308.) While we generally conduct this analysis "through the lens of a presumption against preemption" (*Quesada*, at p. 312), the presumption does not apply in the field of banking because it concerns regulations in an area where there has been a history of significant federal presence (*Silvas v. E\*Trade Mortg. Corp.* (9th Cir. 2008) 514 F.3d 1001, 1004-1005).

The construction of statutes and administrative regulations, and the ascertainment of preemptive intent are pure questions of law. (*Gibson*, *supra*, 103 Cal.App.4th at p. 1297.) "Accordingly, we determine the preemptive effect of either statutes or regulations independently [citation], without deferring to the trial court's conclusion or limiting ourselves to the evidence of intent considered by the trial court." (*Ibid*.)

25

B

*The HOLA Preemption Regulation*

"Enacted to provide emergency relief from massive home loan defaults during the Great Depression, HOLA 'empowered . . . the Office of Thrift Supervision [(OTS)] in the Treasury Department to authorize the creation of federal savings and loan associations, to regulate them, and by its regulations to preempt conflicting state law.' " (*Wigod v. Wells Fargo Bank, N.A.* (7th Cir. 2012) 673 F.3d 547, 576.) "In 1996, the OTS adopted its now superseded lending preemption regulation (12 C.F.R. § 560.2), which is at issue in this case." (*Akopyan v. Wells Fargo Home Mortgage, Inc.* (2013) 215 Cal.App.4th 120, 138-139.)

12 Code of Federal Regulations,[6] section 560.2(a) previously read, inter alia: "*OTS hereby occupies the entire field of lending regulation for federal savings associations.*[7] OTS intends to give federal savings associations maximum flexibility to exercise their lending powers in accordance with a uniform federal scheme of regulation. Accordingly, federal savings associations may extend credit as authorized under federal law, including this part, without regard to state laws purporting to regulate or otherwise affect their credit activities, except to the extent provided in paragraph (c) of this

---

**6**     All further section references are to the Code of Federal Regulations.

**7**     Wells Fargo is not a federal savings association, but is the successor to World Savings Bank, FSB, the originator of Moore's loan. (See *DeLeon v. Wells Fargo Bank, N.A.*, *supra*, 729 F.Supp.2d at p. 1121 ["World Savings had changed its name to Wachovia Mortgage, FSB and then merged into Wells Fargo Bank, N.A."].) Courts are split over whether Wells Fargo would have standing to assert preemption under the circumstances presented here, as a successor to World Savings Bank. (See *Metzger v. Wells Fargo Bank, N.A.* (C.D.Cal. Apr. 28, 2014, No. LA CV14-00526 JAK (SSx)) 2014 U.S. Dist. LEXIS 59427 [collecting cases].) Moore does not, however, challenge Wells Fargo's standing to raise the preemption challenge and we need not consider it because we conclude preemption does not apply.

26

section . . . . For purposes of this section, 'state law' includes any state statute, regulation, ruling, order or judicial decision." (§ 560.2(a), italics added.)

Section 560.2(b) provided examples of the types of laws HOLA preempts, including terms of credit, loan-related fees, disclosure and advertising, and processing, origination, servicing, sale or purchase of, or investment or participation in, mortgages. (§ 560.2(b)(4), (5), (9), (10).) And, section 560.2(c) contained the savings clause, listing the types of state laws (e.g., contract and tort law) *not* preempted "to the extent that they only incidentally affect the lending operations of Federal savings associations or are otherwise consistent with the purposes of paragraph (a) of [section 560.2]." (§ 560.2(c).)

To aid in the preemption analysis, OTS issued a final rule instructing: "When analyzing the status of state laws under § 560.2, the first step will be to determine whether the type of law in question is listed in paragraph (b). If so, the analysis will end there; the law is preempted. If the law is not covered by paragraph (b), the next question is whether the law affects lending. If it does, then, in accordance with paragraph (a), the presumption arises that the law is preempted. This presumption can be reversed only if the law can clearly be shown to fit within the confines of paragraph (c). For these purposes, paragraph (c) is intended to be interpreted narrowly. Any doubt should be resolved in favor of preemption." (61 Fed.Reg. 50951, 50966-50967 (Sept. 30, 1996).)

Section 560.2 was superseded in 2011 by the Dodd-Frank Wall Street Reform and Consumer Protection Act and its implementing regulations. (*Akopyan v. Wells Fargo Home Mortgage, Inc.*, *supra*, 215 Cal.App.4th at p. 136, fn. 8.) OTS's supervisory authority over federal savings associations was transferred to the Office of the Comptroller of the Currency. (*Meyer v. One West Bank, F.S.B.* (C.D.Cal. 2015) 91 F.Supp.3d 1177, 1180.) Dodd-Frank Wall Street Reform and Consumer Protection Act, however, applied prospectively only to loans originated after July 21, 2011; section 560.2 remained applicable to loans originated prior to that date. (*Meyer*, at pp. 1180-1181; *Brown v. Wells Fargo Bank, N.A.* (D.D.C. 2012) 869 F.Supp.2d 51, 56, fn. 5.)

27

Section 560.2 was also recently removed from the Code of Federal Regulations. On October 11, 2017, the Department of Treasury published a final rule titled, "Removal of Office of Thrift Supervision Regulations."[8] (82 Fed.Reg. 47083 (Oct. 11, 2017).) The final rule states: "In order to eliminate the confusion that may arise from having inoperative and superseded regulations of an abolished agency published in the CFR, the Department of the Treasury is removing chapter V of title 12 of the CFR." (*Ibid*.) The final rule further states notice and comment were "not required with respect to the removal of the parts of chapter V that govern the organization and administrative functions of the OTS because those parts have been *inoperative* since the OTS was abolished in 2011" and "[i]t simply removes obsolete provisions that are likely to be a source of confusion." (*Id.* at pp. 47083-47084, italics added.) No court has considered the potential impact of this final rule. We need not do so here because we conclude that, even if section 560.2 applies, Moore's negligence cause of action is not preempted.

C

*The Allegations*

The negligence cause of action incorporated 41 preceding paragraphs, including allegations that Moore had not missed a loan payment, Wells Fargo erroneously determined Moore to be in default of the modified mortgage contract, and Wells Fargo failed to disclose to Moore that he could be responsible for making a balloon payment at the conclusion of the Plan term.

Moore further alleged: Wells Fargo was negligent as a result of its "erroneous beliefs and records" in commencing an improper foreclosure sale, and erroneously

---

[8]    We requested supplemental briefing from the parties regarding the impact and application of this final rule. As explained *post*, however, we need not address the scope of the final rule because we conclude that, even if section 560.2 applies, Moore's negligence cause of action is not preempted.

reporting Moore had defaulted on the loan; Wells Fargo owed Moore a duty to "inter alia, provide accurate information to credit reporting bureaus" and "breached that duty by providing erroneous information to such credit agencies and by failing to provide [Moore] with accurate notice of what it deemed to be a default on the loan in question"; "[a]ny default on the part of [Moore] asserted by [Wells Fargo] [wa]s the result of (1) [Wells Fargo's] wrongful refusal to accept [Moore's] tendered payment pursuant to the Plan[,] (2) [Wells Fargo's] erroneous assertion of its right to immediate payment of the difference between the full mortgage payments and the Plan payments, despite no notice of such a right in the Plan documents[,] and (3) [Wells Fargo's] failure to comply with HAMP guidelines in initiating and administering the Plan"; Moore "ha[d] been damaged in that his credit rating ha[d] been negatively impacted, he [wa]s in danger of losing his home to a wrongful foreclosure and [Wells Fargo] s[ought] to enforce an alleged, but undisclosed, contract term requiring [Moore] to repay sums equivalent to a 'balloon payment,' a term to which [Moore] would not have agreed had such term been disclosed by [Wells Fargo]."

D

*The Arguments And Ruling*

Wells Fargo argued HOLA preempted the negligence cause of action under section 560.2(b)(9) and (b)(10) because his claims were based on the adequacy of the disclosures given in connection with his loan and Wells Fargo's servicing of the loan. In opposition, Moore argued his common law claims against Wells Fargo were based on its failure to follow the HAMP guidelines, precluding the application of section 560.2.

The trial court's written ruling states: "The gravamen of the plaintiff's complaint for negligence is the defendant's failure or omission to inform or explain to him the terms of the forbearance Plan. Specifically, he complains that when he agreed to enter the Plan, he was not informed that upon termination of the Plan he would be required to become fully current and also required to pay a lump sum ('balloon payment') of all the past due

29

amounts; he complains that he was not informed that by not paying the full monthly payments during the forbearance period that he would be considered in default. As an example of defendant's improper conduct, the plaintiff cites the Treasury directive requiring servicers to provide a 'brief explanation regarding what will occur when the borrow [*sic*] is re-employed or when the forbearance plan ends . . . .' [Citation.] It is uncontested in this case that the forbearance plan notice received by the plaintiff did not provide this explanation."

The trial court found the allegations of nondisclosure were preempted under section 560.2(b)(9) and added "the defendant's noncompliance with the HAMP guidelines does not change the analysis that the cause of action for negligence is related to 'disclosure' and specifically preempted under [section] 560.2(b)(9)." The trial court found it pertinent that "[a] private citizen has no cause of action to enforce a HAMP regulation." The trial court further found the remaining allegations in the negligence cause of action preempted under section 560.2(b)(4), (5), and (10), because they concerned "the manner in which the defendant determined the plaintiff's loan balance, due dates, and the 'circumstances under which a loan may be called due,' " and implicated the terms of credit, loan-related fees, and the processing or servicing of the mortgage.

E

*The Trial Court Erred*

We consider the issue by applying the three-step formula outlined by the OTS. Under the first step of the preemption analysis, we consider "whether the type of law in question is listed in [section 560.2,] paragraph (b)." (61 Fed.Reg. 50966 (Sept. 30, 1996).) Under that subdivision, "state laws purporting to impose requirements" regarding 13 enumerated categories are the "types of state laws preempted." (§ 560.2(b).) Although Wells Fargo is alleged to have violated its state law duty in the

30

context of a lending relationship with Moore, the state law claim does not relate to any of the subjects listed in subdivision (b).

A jury's finding that Wells Fargo negligently determined Moore to have missed loan payments or to have been in default under the terms of the modified contract would not impose any state law requirements on Wells Fargo's processing or servicing of loans under section 560.2(b)(10). Moore's claim is not that state law required Wells Fargo to apply his payments in any specific way, but that Wells Fargo erroneously determined and reported him to be in default when he was not.[9] Such claims are not preempted under HOLA. (See *Harris v. Wachovia Mortgage, FSB* (2010) 185 Cal.App.4th 1018, 1026 [breach of contract claim based on allegation servicer misapplied payments not preempted under section 560.2(b)(10) because it was not predicated on a state law requiring the servicer to apply payments in a particular way, but on the premise that it failed to credit the account at all -- a matter of ordinary contract law with no impact on the servicer's lending activities]; see also *Ayala v. World Savings Bank, FSB* (C.D.Cal. 2009) 616 F.Supp.2d 1007, 1013-1014 [where claim falls on the common law side rather than on the regulatory side and the state law does not concern the extension of credit, the cause of action does not fall within section 560.2(b)].) It is further established that a claim of negligence based on credit reporting violations is also not preempted by HOLA. (*Hussey-Head v. World Savings & Loan Assn.* (2003) 111 Cal.App.4th 773, 775-783.) Moore raised such allegations in support of his negligence cause of action.

We need not and do not consider whether the other allegations in support of the negligence cause of action relate to any of the subjects listed in subdivision (b) of section 560.2 because a motion for judgment on the pleadings "does not lie as to a

---

[9]     An allegation we accept as true for purposes of ruling on the motion for judgment on the pleadings. (*People ex rel. Harris v. Pac Anchor Transportation, Inc.*, *supra*, 59 Cal.4th at p. 777.)

31

portion of a cause of action, and if any part of a cause of action is properly pleaded, the [motion] will be overruled." (*Fire Ins. Exchange v. Superior Court*, *supra*, 116 Cal.App.4th at p. 452.)

"Moving to the second step, the [negligence cause of action] do[es] affect lending businesses, just as they affect any other business that [applies payments to a debt] during the course of its operations. Therefore, under the OTS's interpretation of the regulation, a presumption of preemption arises." (*Gibson*, *supra*, 103 Cal.App.4th at p. 1303.)

Under the third step, however, the presumption is rebutted if the state law at issue is a general tort law that incidentally affects only lending operations. (61 Fed.Reg. 50966 (Sept. 30, 1996); § 560.2(c)(4).) In determining whether the effect is more than incidental, "we are guided by OTS's own explanation of the intended scope of its regulatory preemption. At the time section 560.2 was issued, OTS stated that 'the purpose of paragraph (c) is to preserve the traditional infrastructure of basic state laws that undergird commercial transactions . . . .' [Citation.] Accordingly, section 560.2 does not 'preempt basic state laws such as state uniform commercial codes and state laws governing real property, contracts, torts, and crimes.' [Citation.] The limitation that the effect of those laws on lending cannot be more than incidental is intended to catch 'state laws that may be designed to look like traditional property, contract, tort, or commercial laws, but in reality are aimed at other objectives, such as regulating the relationship between lenders and borrowers, protecting the safety and soundness of lenders, or pursuing other state policy objectives.' " (*Gibson*, *supra*, 103 Cal.App.4th at p. 1303.)

The alleged duties to accurately and appropriately apply payments to a debt in accordance with the parties' agreement and to appropriately determine and report a debtor's payment status (i.e., whether he is in default) are principles of general application. It is "not designed to regulate lending and do[es] not have a disproportionate or otherwise substantial effect on [federal savings association's] lending. To the contrary, [it is] part of the legal infrastructure that undergird [numerous] contractual and

32

commercial transactions." (*Gibson, supra*, 103 Cal.App.4th at pp. 1303-1304.)  The

effect of the negligence cause of action is, therefore, incidental and not preempted.

Wells Fargo believes Moore's negligence claim is like the preempted breach of

contract claim in *Akopyan*.  (*Akopyan v. Wells Fargo Home Mortgage, Inc.*, *supra*, 215

Cal.App.4th 120.)  We disagree.  In *Akopyan*, the plaintiffs argued a California statute

(Bus. & Prof. Code, § 10242.5, subd. (b)) was implicitly incorporated into their loans,

imposing on servicers a payment application requirement and limitation on late payment

charges.  (*Akopyan*, at pp. 129, 132.)  The breach of contract claim was preempted

because it sought to apply state law "to limit [a servicer's] ability to service the loans

according to [the] express terms [of the loan] and to require that it service them in

accordance with the specific state statute that applies to the loans."  (*Id*. at p. 147.)  Here,

in contrast, we know of no express loan term negated by Moore's negligence claim and

Wells Fargo identifies none.

That Moore seeks to introduce and rely upon the HAMP guidelines to support his

cause of action does not transform the whole cause of action into a disclosure claim

preempted by section 560.2(b)(9).  If a jury were to find that Wells Fargo breached its

duty of care because it was required to disclose or do certain things pursuant to the

HAMP guidelines,[10] such requirements would not be *state* imposed requirements.[11]  The

---

[10]     Even if, as the trial court found, HAMP does not create a duty of care (an issue we need not decide for purposes of this appeal), some courts have said "violation of a regulation such as HAMP may provide evidence of a breach of duty *otherwise owed*." (*Brown v. Bank of America Corp.* (D.Mass. Mar. 31, 2011, Civ. A. No. 10-11085) 2011 U.S. Dist. LEXIS 36235, *12; *Markle v. HSBC Mortgage Corp.* (D.Mass. 2011) 844 F.Supp.2d 172, 185 [citing *Brown*].)

[11]     None of the federal district court cases cited by Wells Fargo in its motion for judgment on the pleadings or its reply addressed a similar situation -- where prevailing on the state law cause of action would merely impose federal requirements already applicable or voluntarily assumed contractual obligations.

requirements would either be imposed under federal law (*Bushell v. JPMorgan Chase Bank, N.A.* (2013) 220 Cal.App.4th 915, 923 ["[l]enders must perform HAMP loan modifications in accordance with Treasury regulations"]) or pursuant to voluntarily assumed contractual obligations (*Wigod v. Wells Fargo Bank, N.A.*, *supra*, 673 F.3d at p. 556 [the federal government and Wells Fargo entered into a servicer participation agreement, which requires Wells Fargo to comply with, among other things, the HAMP guidelines]; see *West v. JPMorgan Chase Bank, N.A.*, *supra*, 214 Cal.App.4th at pp. 796-797 ["[w]hen Chase Bank received public tax dollars under the troubled asset relief program, it agreed to offer [programs] under HAMP according to guidelines, procedures, instructions, and directives issued by the Department of the Treasury," fn. omitted]). In either case, preemption does not apply. (*McKell v. Washington Mutual, Inc.* (2006) 142 Cal.App.4th 1457, 1485-1486 [unfair competition cause of action not preempted under HOLA where plaintiffs were "using it to enforce federal law governing the operation of federal savings associations" rather than to enforce a state law purporting to regulate the lending activities of a federal savings association]; *Gibson*, *supra*, 103 Cal.App.4th at p. 1302 [HOLA preemption did not apply to contractual duties voluntarily assumed by a federal savings association].)

Wells Fargo further argues reversal of the ruling would be inappropriate because Moore has not shown prejudice. We disagree. Moore was precluded from presenting his negligence claim to the jury at trial; he was, therefore, prejudiced by the trial court's erroneous ruling. (See *Deeter v. Angus* (1986) 179 Cal.App.3d 241, 251 [error in sustaining demurrer without leave to amend is reversible per se because it effectively deprived the affected party of the opportunity to prove his or her cause of action and amounted to denial of a fair hearing].)

The ruling on the motion for judgment on the pleadings is reversed.

# III

*Fraud*

## A

*Factual Background*

### 1

*Pertinent Trial Evidence*

After Moore became unemployed in April 2009 due to layoffs, he paid his mortgage through a combination of unemployment benefits and savings. He called Wells Fargo at the end of September 2010 to discuss potential borrower assistance programs because he knew that, if he did not find employment, he would have difficulty paying his mortgage in a year or two. He also considered renting out his house and moving in with family or a friend, or taking on a roommate.

Moore spoke to two unknown Wells Fargo representatives during the same call in September 2010. He discussed his concerns regarding his unemployment with the first representative, who responded Wells Fargo had a program that "allows you to make a reduced payment, and it's something that can lead to the possibility of a permanent loan modification." Moore was then transferred to the second representative. The second representative said "they had a program called the unemployment forbearance program, that under the terms of the program the bank would establish a reduced payment for a period of some time. . . . And at the end of that period of time, [he] would be evaluated for a permanent loan modification." When Moore asked what the reduced payment was likely to be, the representative said they would require additional financial information to determine the amount.

Moore also asked: "what's the downside; what happens if for some reason I'm unable to meet the terms of that forbearance period?" While Moore could not recall the exact response to his question, "the gist of it was [not to] worry about it, there [wa]s no downside to the program. If [Moore] for some reason [did not] get in the program, [he

would] just go back to [his] regular monthly payment." The representative further said that when "the modified permanent modification was made, that any amount owing would be rolled back into the new modification or stuck on the end of it," and, if he did not qualify for the modification, "worse case [wa]s [he would] just go back to the payments that [he was] making [then]." There was no further discussion about what would happen to the arrearage if he did not get a permanent modification. Moore understood that, at the end of the successful completion of the Plan, he would be evaluated for a permanent modification. If unsuccessful, he would go back to paying his normal payments.

Moore mentioned he needed to make his normal monthly mortgage payment, but the representative told him: "Don't worry about that. Just hang on to that payment. We'll figure out how that will work out, depending upon whether you are accepted into the forbearance program or not." The representative then took down Moore's financial information and told him they would send a written application, which he got within several days. Moore filled out the application and later received the Notice.

Moore read the Notice, which he understood established the terms of the agreement between himself and Wells Fargo. He understood the payments under the agreement would replace his regular full payments for the period of the forbearance. Nothing in his subsequent conversations with Wells Fargo representatives contradicted this understanding. Moore made his first Plan payment on November 1, 2010.

On November 30, 2010, Moore called Wells Fargo to provide an update on his employment status, as required under the Plan. During that conversation, Moore spoke with David and mentioned he had received two notices indicating he was in arrears on his normal monthly payment. David told Moore to disregard the notices because they were computer generated and did not account for his participation under the Plan. Moore expressed concern: "Okay. I'm just, you know, in terms of that affecting credit or, you

36

know, the bank taking action against me, not being aware of this program, I just want to make sure that that doesn't happen." David responded, "[n]o."

Moore called Wells Fargo again on December 31, 2010, this time speaking with Stephen. Moore reiterated his concern that his regular monthly billing statement showed "an increasing amount as overdue" and that he did not want it to impact his credit. Stephen explained Moore would continue to receive those monthly payments indicating he was past due, "[b]ut when you're done with this plan and you do get -- do get approval for modification, whatever then is owed will be put back into the loan so you're still going to receive those, those statements, sir." Like David, Stephen assured Moore the Plan payments would not impact his credit.

Although Moore recalled having made a call to Wells Fargo in January 2011, there was no transcript of that call. The next transcribed call was Moore's discussion with Emma on February 2, 2011. Moore told her he continued to receive statements under the normal payment schedule and letters from the bank regarding alternatives to assist with payments. Emma responded he was receiving those because the system showed he was past due; however, they knew he was in the Plan.

Moore spoke to Luz, another Wells Fargo representative, on March 2, 2011. A recording of the call was played for the jury and a transcript was provided. After Luz processed Moore's payment, Moore asked: "are you familiar with the program beyond the period of six months, exactly what happens at that point?" Luz responded: "Well, this is just allowing you time to -- for you to gain employment. [If] [f]or any reason you don't gain employment or you're not receiving unemployment benefits, you're going to have to come up with the balloon payment that is due at the end of the program." Moore said: "Now, I have nothing anywhere, nor has anyone previously indicated that that would be the case." Moore explained he had called Wells Fargo several times asking questions about the Plan and was never advised about the balloon payment. Luz said, at different times, "[t]hey should have advised [Moore] once [he] applied for this program"

37

and "this should have been explained to [him] at the beginning of the program." "Because these are the terms and conditions of the program."

When Moore asked whether she knew why he had not previously been notified of the balloon payment, Luz said "because they were expecting for you to gain employment within the next six months." Moore expressed his shock and dismay regarding the new information several times, including: (1) "So rather than paying $2400 a month to the bank, I could have been paying $600 a month, improving my financial position, you know, throughout the course of that entire time. Was never notified until the very end of this, you know, almost reluctantly by the bank. [¶] And now you're telling me for the first time in all my conversations, you know, over these past five months, where I've done exactly what you folks have asked me to do, which is to call if [I] have questions, and I've asked the specific questions I've asked, you're the first person [who's] telling me the balloon payment is due. And I've got nothing on paper in that regard. That's, you know, unbelievable to me"; and (2) "But you -- you know, can you understand my predicament at all here, Luz? Because, I mean, this -- this comes as a bit of a shock, and that's a fairly severe financial shock after five months to know that that payment is -- that that amount would be -- would be due at this point. You know, and quite frankly, I probably would have handled this whole thing very differently if I had had that knowledge."

Luz apologized that Moore was not "given this information at the beginning[,]" explaining "[b]ecause when I -- when I take these kinds of applications, I let them know, you know. I let them know exactly what they're getting themselves into." She said she had previously advised her supervisors when she received calls from other "people stating to [her] that they were not advised of a balloon payment." She brought it to their attention because it was a training issue. She had also taken "elevated calls" from borrowers upset that they had not been advised the Plan would affect their credit.

38

Luz further told Moore she did not believe he would get an extension under the Plan because he was no longer receiving unemployment income. He also would not qualify for a modification unless he received a "steady income," like social security. Moore asked whether social security income would qualify him for a continuation of the Plan; Luz responded it would not, but it could be considered to determine if he was eligible for a modification. Luz said she did not know whether Moore would qualify for a modification because he would have to meet the specific guideline requirements.

Moore did not believe Luz regarding the balloon payment because "as [he] indicated many times in that conversation, [he] over and over again asked about the end result" and "this information that [he] was hearing from her for the first time completely contradicted all of those conversations." He further reviewed the Notice again and did not see any mention of a balloon payment. He also did not believe Luz that Wells Fargo was reporting him as a deficient borrower to the credit bureaus, or that he was considered to be in default on his mortgage. Moore, however, filed for retirement social security benefits the day following his discussion with Luz; Moore was 63 years old.

On April 1, 2011, Moore made his monthly call to Wells Fargo and spoke with Javier. After Moore made his payment, Javier asked whether Moore wanted to be reviewed for a modification. Moore said he did, and Javier said someone would contact him to discuss his income and expenses. Moore, thereafter, spoke to a representative to discuss his finances. Moore also made payments under the Plan in May, June, and July 2011. His expectation was he would continue to make Plan payments until he was advised otherwise and would be considered for a permanent loan modification.

In a letter dated June 20, 2011, Wells Fargo notified Moore he did not qualify for a loan modification. Three days later, Moore received a notice of intent to foreclose stating Wells Fargo had "not received the last nine mortgage payment(s)." The letter further stated the "loan [wa]s in default and due for the October 15, 2010 payment, and all subsequent payments that have come due and late charges," and demanded a balloon

payment of $20,624.56, which included $163.38 in late charges,[12] to be paid by July 23, 2011.

In terms of damages, Moore testified the dispute with Wells Fargo affected his mental and physical health, causing, among other things, headaches, ringing ears, rapid heartbeats and elevated blood pressure, stomach distress, nervousness, changes in demeanor, memory impacts, problems sleeping, and weight loss. His friend echoed his testimony, identifying various physical and emotional changes in Moore after he was informed about the balloon payment.

Moore's clinical psychologist testified he diagnosed Moore with a high level of stress, signs and symptoms of depression, and possible anxiety. Moore had seen the psychologist multiple times and paid for the treatment at a rate of $250 for the first session and $200 for each subsequent session. The psychologist recommended psychotherapy and a consultation with a psychiatrist for medication. He estimated the psychotherapy would cost between $2,200 and $5,000, and the psychiatric treatment between $1,300 and $2,900.

Moore estimated the value of his house was approximately $540,000 in September 2010, when he owed between $325,000 and $330,000 on his mortgage. Moore estimated the value of his house had decreased by approximately $100,000 during the Plan period. Moore also briefly testified his credit was affected; however, he acknowledged he occasionally paid his mortgage late in 2010 and knew it would affect his credit.

Brian Kelley, a banking expert, testified forbearance is defined as "somebody not exercising rights or remedies that [he or she] could otherwise exercise." He explained the Program was part of HAMP and intended to assist people temporarily unemployed until

---

[12]    The late fee was charged for the missed September 2010 payment, before Moore started making the Plan payments. Wells Fargo did not charge any late charges during the Plan.

they found a new position, as "a Band-Aid" for three to six months. When they found a new position, they would file for a loan modification under HAMP. He framed the Program as "an interim bridge to get somebody into HAMP" and said "[o]bviously if someone is not qualified under HAMP, there is absolutely no reason to put them into a UP program." While a servicer could get up to $4,500 from the Department of Treasury under the HAMP agreement for a loan modification plus at least $1,000 per year for five years thereafter, a servicer does not receive compensation for a borrower's participation in the Program.

The ideal candidate for the Program, Kelley explained, is someone recently unemployed with little or no equity or upside down on the loan, someone who has already missed payments or is in default under the loan, and someone anticipating reemployment in a short period of time. In contrast, a poor candidate for the Program is someone with substantial equity who had not defaulted on the loan and someone unemployed for a long period of time or who does not anticipate reemployment in a short timeframe. Participation in the Program would be detrimental to such a candidate because equity in the home would preclude qualification under HAMP, he or she would continue to accrue the unpaid payments, and the lender would report the borrower to be in default under the loan despite the interim payments, essentially reporting the interim payments as missed payments. The credit reporting "could have a real impact to the borrower's FICO score and [his or her] credit standing and certainly the availability of credit." The other downside risk for a poor candidate is the balloon payment that would be due at the end of the Plan period. And, interest would continue to accrue on the difference between the normal and reduced payments.

Based on Kelley's calculations, Moore never would have qualified for a HAMP modification. He also explained the bank would make more money foreclosing on a property with substantial equity than by making a HAMP modification. The deposition testimony of a Wells Fargo representative, a portion of which was played via video for

41

the jury, supported this point; the representative said a person with substantial equity "is never [going to] get [his or her] loan modified." The person would "be told to sell the property, get your cash, and move on."

In Kelley's opinion, Wells Fargo should have accurately told Moore what he was getting into and what was expected, and should have disclosed the risks of the Program. He explained Directive 10-04 required Wells Fargo to include in the Notice a brief explanation of what would occur if Moore was reemployed or when the forbearance period ended.

A portion of the deposition testimony of Barbara Valdez, a Wells Fargo employee, was read into the record. Valdez was Wells Fargo's person most knowledgeable of, among other things, the policies and practices regarding the Program during the pertinent timeframe, communications with Moore regarding the Plan, preparation of the Notice, and Moore's eligibility for modification under HAMP. She testified Wells Fargo agreed to follow Directive 10-04 and set up the "UP program" in response. Wells Fargo prepared a process "for the representatives to be aware of the program and as to when to offer the program as well." When asked: "In the documents you reviewed, in the training that you participated in, do you recall any training or guidelines that applicants for the UP program were to be told that they would be subject to balloon payments if they did not qualify for a HAMP modification"? Valdez responded: "I don't recall balloon payments being mentioned with the UP program."

Valdez explained the Notice received by Moore was populated from a form document; the representative only inputted the monthly payment amount and the payment dates, the remainder of the language remained unchanged. The representative who spoke with Moore determined the term of the Plan period. Valdez acknowledged the Notice did not include a brief explanation of what would occur when Moore was reemployed or when the Plan ended, as required under Directive 10-04.

She further testified Moore was considered in default under the loan during his participation in the Plan because he was not making the full payments; however, she acknowledged the Notice did not mention default. She further acknowledged the Notice made no mention of a balloon payment and did not specifically state Moore was liable for the difference between the Plan payments and the normal payments at the end of the Plan period.

2

*Jury Instructions And Findings*

The trial court instructed the jury on fraud by intentional misrepresentation and fraud by concealment. The jury instruction regarding the intentional misrepresentation claim limited the scope of that claim as follows: "Gregory Moore claims that Wells Fargo employees he spoke with before entering into the [unemployment] forbearance plan and after entering into the [unemployment] forbearance plan made false representations that harmed him." Moore did not object.

The jury found in favor of Moore on the intentional misrepresentation claim, but did not find fraud by concealment. The jury awarded Moore $500 in damages for past economic loss (medical expenses), $2,800 for future economic loss (medical expenses), and $100,000 for past noneconomic loss, including physical pain and emotional distress. The jury found no damages for, among other things, a reduction in social security benefits.

B

*Standard Of Review*

The trial court's discretion in granting a motion for judgment notwithstanding the verdict is severely limited. " 'The trial judge's power to grant a judgment notwithstanding the verdict is identical to his power to grant a directed verdict [citations]. The trial judge cannot reweigh the evidence [citation], or judge the credibility of witnesses. [Citation.] If the evidence is conflicting or if several reasonable inferences

may be drawn, the motion for judgment notwithstanding the verdict should be denied. [Citations.] "A motion for judgment notwithstanding the verdict of a jury may properly be granted only if it appears from the evidence, viewed in the light most favorable to the party securing the verdict, that there is no substantial evidence to support the verdict. If there is any substantial evidence, or reasonable inferences to be drawn therefrom, in support of the verdict, the motion should be denied." ' " (*Clemmer v. Hartford Insurance Co.* (1978) 22 Cal.3d 865, 877-878.)

"An appellate court reviews the grant or denial of a motion for [judgment notwithstanding the verdict] de novo using the same standard as the trial court." (*Oakland Raiders v. Oakland-Alameda County Coliseum, Inc.* (2006) 144 Cal.App.4th 1175, 1194.) "When reviewing the validity of a judgment notwithstanding the verdict, an appellate court must resolve any conflict in the evidence and draw all reasonable inferences therefrom in favor of the jury's verdict." (*Czubinsky v. Doctors Hospital* (1983) 139 Cal.App.3d 361, 364.)

## C

### *The Trial Court Erred*

"The essential elements of a count for intentional misrepresentation are (1) a misrepresentation, (2) knowledge of falsity, (3) intent to induce reliance, (4) actual and justifiable reliance, and (5) resulting damage." (*Chapman v. Skype, Inc.* (2013) 220 Cal.App.4th 217, 230-231.) Moore identifies five misrepresentations he claims supports the jury's verdict: (1) "[n]o downside to program; just go back to regular payments"; (2) "[j]ust hang onto the September 2010 payment"; (3) statements in the Notice; (4) the statement in November 2010 that the overdue statement did not reflect the agreement under the Plan; and (5) the calls between November 2010 and February 2011 regarding the statements showing Moore was in arrears.

Based on the evidence produced at trial, we conclude there was substantial evidence from which the jury could reasonably find or infer Wells Fargo made

44

intentional misrepresentations to Moore based on the September 2010 statements that there was no downside to the program and Moore would just go back to regular payments if he did not qualify for a modification.[13]  Accordingly, we do not consider whether the other statements qualified as misrepresentations as well.

First, the statement that there would be "no downside to the program" was a misrepresentation of a fact.  Wells Fargo argues the statement was an expression of opinion as to possible future acts or events that could have changed during the Plan term.  We disagree.  "When a statement, although in the form of an opinion, is 'not a casual expression of belief' but 'a deliberate affirmation of the matters stated,' it may be regarded as a positive assertion of fact.  [Citation.]  Moreover, when a party possesses or holds itself out as possessing superior knowledge or special information or expertise regarding the subject matter and a plaintiff is so situated that it may reasonably rely on such supposed knowledge, information, or expertise, the defendant's representation may be treated as one of material fact."  (*Bily v. Arthur Young & Co.* (1992) 3 Cal.4th 370, 408.)

In this vein, the trial court appropriately instructed the jury that "Wells Fargo's opinion is considered a representation of fact if Gregory Moore proves that Wells Fargo claimed to have special knowledge about the subject matter that Gregory Moore did not have or Wells Fargo made a representation, not as a casual belief or not as a casual expression of a belief, but in a way that declared the matter to be true; or Wells Fargo had a relationship of trust and confidence with Gregory Moore; or Wells Fargo had some other reason to expect that Gregory Moore would rely on [its] opinion."

---

**13**     We do not consider whether the language in the Notice gave rise to an affirmative misrepresentation as urged by Moore.  The trial court expressly limited the intentional misrepresentation jury instruction to verbal statements and Moore did not object.

Wells Fargo certainly had superior knowledge and special information regarding the terms and conditions of the Plan it recommended to Moore -- there was no evidence introduced at trial to show Moore independently had access to such information. Luz, a Wells Fargo representative, explained the Plan's downside risks of negative credit reporting and potential liability for the balloon payment were "terms and conditions of the program" and that "[t]hey should have advised [Moore of these risks] once [he] applied for this program" and "this should have been explained to [him] at the beginning of the program." Kelley, a banking expert, echoed these statements, also identifying negative credit reporting and potential liability for the balloon payment as downside risks of the Program.

This evidence supports a finding that the "no downside" risks representation was a false statement of fact not a statement of opinion, and a deliberate affirmation of the matters stated. It was not merely an opinion as to some future event because the terms and conditions of the Plan were existing facts when the statement was made. Indeed, the representative explained some of the terms to Moore during that phone conversation, when he or she said "they had a program called the unemployment forbearance program, that under the terms of the program the bank would establish a reduced payment for a period of some time. . . . And at the end of that period of time, [he] would be evaluated for a permanent loan modification." The "no downside" statement was further made in response to a direct question seeking to elicit information regarding the terms and conditions of the Plan to evaluate whether the Plan was a good fit under the circumstances. A jury could thus reasonably infer Wells Fargo had a reason to expect Moore would rely on the "no downside" statement in rendering his decision.

We also disagree with Wells Fargo's assertion that the "no downside" statement was true. Wells Fargo believes the statement was accurate because Moore was not charged fees or additional interest while in the program, he "owed no more money after entering the plan than before," and there was no credible evidence of any resultant credit

46

impact.[14] Wells Fargo attempts to read the evidence in its favor; however, " '[i]f the evidence is conflicting or if several reasonable inferences may be drawn, the motion for judgment notwithstanding the verdict should be denied.' " (*Clemmer v. Hartford Insurance Co.*, *supra*, 22 Cal.3d at pp. 877-878.)  As explained *ante*, there was substantial evidence from which the jury could find or infer the statement was false.

The representative's statement that, if Moore did not qualify for a modification, "worse case [wa]s [Moore would] just go back to the payments that [he was] making [then]," also qualifies as a misrepresentation.  Like the "no downside" statement, this statement was an explanation of the terms and conditions of the Plan.  In Wells Fargo's view, the statement was true because, if Moore had paid the balloon payment, he would have gone back to his normal payments.  The problem with this argument is that the representative did not say anything about having to pay a balloon payment.  That gives rise to a " 'misleading half-truths' situation," which qualifies as a misrepresentation. (*Randi W. v. Muroc Joint Unified School Dist.* (1997) 14 Cal.4th 1066, 1082, 1084.)  As our Supreme Court said, one who undertakes to provide some information is obliged to disclose all other facts which " 'materially qualify' " the limited facts disclosed.  (*Id*. at p. 1082.)  The failure to disclose a "reservation or qualification" to the facts given, as here, amounts to an affirmative misrepresentation.  (*Id.* at p. 1084.)  As Wells Fargo acknowledged in its brief, "the only way [Moore] could go back to his regular payments was if he paid the arrearage."

Wells Fargo also argues the entire September 2010 conversation should be disregarded for the following reasons:  (1) Moore failed to specifically identify the

---

**14**      Wells Fargo argues Kelley's testimony regarding the credit impact was "without a valid foundation."  We note the trial court overruled Wells Fargo's objections to Kelley's testimony on this ground and, on appeal, Wells Fargo does not challenge the trial court's ruling or explain why the ruling was in error.

conversation in his complaint and did not rely on the conversation in opposition to the motion for judgment notwithstanding the verdict; (2) Moore is attempting to litigate a different theory on appeal because the allegations in the complaint and Moore's counsel's closing argument show Moore did not present the September 2010 conversation to the jury as a basis for the fraud claim; and (3) Moore presented no evidence of who made the statements or whether he or she had authority to speak on behalf of Wells Fargo. These arguments need not detain us long.

We focus on the evidence *presented to the jury at trial* to determine whether the trial court erred in granting the motion. The allegations in the complaint were not presented to the jury and an attorney's closing argument is not evidence. (Evid. Code, § 140; *People v. Kiney* (2007) 151 Cal.App.4th 807, 815 ["[u]nsworn statements of counsel are not evidence"].) In contrast, testimony regarding the September 2010 conversation was presented to the jury, as discussed *ante*, and the trial court considered the September 2010 testimony in its ruling (including the "no downside" statement). We do the same.

Regarding the "identity issue," we note Moore introduced Valdez's deposition testimony at trial. In her testimony, Valdez reviewed an internal Wells Fargo document, which showed two entries reflecting phone calls between Moore and Wells Fargo representatives on September 30, 2010. The document contained the initials of the Wells Fargo agents who spoke with Moore. For example, the log showed "JJB" spoke with Moore during the first call on September 30, 2010. This testimony shows Wells Fargo could have identified its own representatives if it chose to do so.

Further, based on Moore's and Valdez's testimony, the jury could have reasonably inferred the representatives had authority to speak on Wells Fargo's behalf given the context of the discussion and Wells Fargo introduced no evidence to refute any such inference. Wells Fargo also did not object to Moore's testimony regarding the September 2010 conversations on the grounds it now attempts to assert.

48

Turning to the second requisite element for intentional misrepresentation -- knowledge of the falsity -- we note the element may be satisfied when, as the jury was properly instructed, the representation was made recklessly or without regard for the truth. (*Engalla v. Permanente Medical Group, Inc.* (1997) 15 Cal.4th 951, 974 [" '[F]alse representations made recklessly and without regard for their truth in order to induce action by another are the equivalent of misrepresentations knowingly and intentionally uttered' "].) Given that the negative credit reporting and balloon payment were part of the terms and conditions of the Plan, which it appears the Wells Fargo representatives had access to, the jury could reasonably infer from the evidence that Wells Fargo made the statements recklessly or without regard for the truth.

Luz explained the Plan's downside risks of negative credit reporting and potential liability for the balloon payment were "terms and conditions of the program" and that "[t]hey should have advised [Moore of these risks] once [he] applied for this program" and "this should have been explained to [him] at the beginning of the program." She also explained that she provided this information to applicants to "let them know exactly what they're getting themselves into," but some representatives did not follow the guidelines like she did. The scienter requirement is satisfied if the statements were recklessly made in a manner not warranted by the information available to the defendant. (*Yellow Creek Logging Corp. v. Dare* (1963) 216 Cal.App.2d 50, 57.)

The third element is satisfied if the defendant intended to induce reliance or where it was reasonably expected to occur. (*Lovejoy v. AT&T Corp.*, *supra*, 92 Cal.App.4th at p. 93.) As we explained in *Lovejoy*, "[f]ew defrauding defendants give any serious thought to the nature or quality of the harm which could befall the victims who rely on their deceptive acts. It would be unconscionable and nonsensical for such perpetrators to escape liability because of their indifference to the consequences of their opprobrious behavior." (*Id*. at p. 94.) Here, Moore's testimony regarding his conversation with the first Wells Fargo representative shows he asked about borrower assistance programs

49

given his unemployment and the representative recommended the Plan. The second representative then made misrepresentations regarding the terms and conditions of the Plan in response to Moore's questions. And, at the conclusion of that conversation, the representative took down Moore's financial information and told him Wells Fargo would send an application, which he got within several days. From these facts, the jury could have inferred Wells Fargo reasonably expected Moore to rely on the misrepresentations by encouraging him to believe that the Plan would function appropriately for his circumstance. (See *Engalla v. Permanente Medical Group, Inc.*, *supra*, 15 Cal.4th at p. 976 [statements misrepresenting the workings of an arbitration program could plausibly be viewed as reflecting an intent to induce subscription or renewal of subscription in a plan because it could reasonably be inferred that the misrepresentations touting the virtues of the program were made to encourage subscribers to believe the program would function efficiently].)

The fourth element requires actual and justifiable reliance on the misrepresentation.[15] " 'Actual reliance occurs when a misrepresentation is " 'an immediate cause of [a plaintiff's] conduct, which alters his legal relations,' " and when, absent such representation, " 'he would not, in all reasonable probability, have entered into the contract or other transaction.' " ' " (*Conroy v. Regents of University of California* (2009) 45 Cal.4th 1244, 1256.) " 'Besides actual reliance, [a] plaintiff must also show "justifiable" reliance, i.e., circumstances were such to make it *reasonable* for [the] plaintiff to accept [the] defendant's statements without an independent inquiry or

---

**15** The jury was instructed that Moore relied on the misrepresentations if: "1. The misrepresentation or concealment substantially influenced him to enter into the Unemployment Forbearance Program as part of his request for consideration for a HAMP loan modification offered by Wells Fargo; and [¶] 2. He would probably not have entered into the Unemployment Forbearance Program as part of his request for consideration for a loan modification offered by Wells Fargo without the misrepresentations or concealment."

50

investigation.' [Citation.] The reasonableness of the plaintiff's reliance is judged by reference to the plaintiff's knowledge and experience." (*OCM Principal Opportunities Fund, L.P. v. CIBC World Markets Corp.* (2007) 157 Cal.App.4th 835, 864.)

A presumption or inference of reliance "arises wherever there is a showing that a misrepresentation was material." (*Engalla v. Permanente Medical Group, Inc.*, *supra*, 15 Cal.4th at p. 977.) A misrepresentation is material if a reasonable person " 'would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question.' " (*Ibid*.) During the conversation with Luz, Moore said he "probably would have handled this whole thing very differently if [he] had had th[e] knowledge" about the negative implications of participating in the Plan. This testimony indicates the misrepresentation was material to Moore's decision to enter into the Plan; we conclude a reasonable person would also attach importance to the terms and conditions of a program in determining whether to enter into a transaction. Wells Fargo points to no evidence in the record "to conclusively rebut the inference" of reliance on the misrepresentations. (*Id.* at p. 979.)

Moore's testimony further supports the jury's finding of actual reliance because, but for his conversations with the Wells Fargo representatives in September 2010, Moore would have been unaware of the Plan and would not have entered into it. The representatives recommended and described the Plan to Moore, and Moore provided his financial information to commence his application under the Plan. Moore then filled out the paperwork shortly after the conversations and the Notice was issued on October 8, 2010. The September 2010 conversations were, therefore, an immediate cause of Moore's participation in the Plan, which altered his legal rights and duties.

There is also substantial evidence of justifiable reliance. Wells Fargo was in a superior position to know the terms and conditions of the Plan it was offering to Moore, as Luz explained. Moore reviewed the Notice and found nothing contradictory therein based on the information he received during the September 2010 conversations, and

51

Valdez, a Wells Fargo representative, acknowledged in her deposition testimony that the Notice did not mention a balloon payment or that the reduced payments would be considered a default under the loan. That Moore "is a law school graduate," as Wells Fargo asserts, does not change the reasonableness of his reliance. As we explained *ante*, the contract documents were ambiguous and could reasonably be read in favor of Moore's interpretation.

The final element of resultant damage was supported by the testimony of Moore, his clinical psychologist, and his friend relating to Moore's mental and physical health impacts arising from Wells Fargo's actions. Wells Fargo argues Moore had no cognizable damages because the jury awarded emotional distress damages without finding a separate economic loss. It posits the medical costs awarded by the jury "flowed from [Moore's] emotional distress" and "Moore cannot bootstrap an economic loss onto a claim purely for emotional distress by paying $500 for treatment." We disagree.

Moore correctly points out that past and future medical costs are economic damages. (Civ. Code, § 1431.2, subd. (b)(1) ["the term 'economic damages' means objectively verifiable monetary losses including medical expenses, loss of earnings, burial costs, loss of use of property, costs of repair or replacement, costs of obtaining substitute domestic services, loss of employment and loss of business or employment opportunities"]; *DaFonte v. Up-Right, Inc.* (1992) 2 Cal.4th 593, 600.) The jury's award of $500 for past medical expenses and $2,800 for future medical expenses was based on "objectively verifiable monetary losses," and fell within the reasonable range permitted by the evidence given the testimony by Moore's clinical psychologist. (*Abbott v. Taz Express* (1998) 67 Cal.App.4th 853, 857 ["We do not question the discretionary determinations of jury and judge, so long as they fall within a reasonable range permitted by the evidence"].)

For these reasons, the trial court erred in granting Wells Fargo's motion for judgment notwithstanding the verdict. The trial court's ruling is reversed and the jury's verdict reinstated.

## IV

### *Unfair Competition Law*

In his unfair competition law cause of action, Moore generally alleged Wells Fargo: "engaged in unfair and deceptive business practices in inducing [Moore] to enter into the Plan[,] in the creation of the [Notice], and in the administration of the Plan during the forbearance period"; "withheld disclosure of material terms of the Plan, the disclosure of which would have deterred [him] from entering the Plan"; engaged in unfair and deceptive business practices in the manner it applied Moore's Plan payments; and engaged in deceptive business practices relating to the improper foreclosure and the demand for fees, penalties, and interest.

Following the jury's verdicts, the trial court permitted the parties to file points and authorities relating to their positions on the unfair competition law cause of action. The trial court entered judgment in favor of Wells Fargo based on: (1) its finding the jury erred in finding an affirmative misrepresentation; (2) the jury's verdict of no fraud by concealment; (3) "the Court's interpretation of the contractual agreement whereby the Court ha[d] found, as a matter of law, that the defendant *was* permitted to require the plaintiff to become fully current when the [P]lan ended and could commence foreclosure proceedings if the plaintiff defaulted," which indicated "plaintiff's damages for emotional distress were not caused by any misstatements of the defendant, but rather by Moore's own erroneous misinterpretation of the forbearance plan terms and his election to remain in the forbearance plan after being informed of the nature and terms of it"; and (4) other equitable considerations, including "evidence that the plaintiff provided materially inaccurate information during his depositions and also in the declaration he submitted to the court to obtain the restraining order in this case."

53

We reverse the ruling because we have reversed the pretrial and posttrial rulings upon which the trial court relied in reaching its conclusion. We disagree with Wells Fargo that the claim is moot. While it is true, as Wells Fargo contends, "Moore acknowledges that the home has been foreclosed upon and that an injunction barring foreclosure is no longer an option," Business and Professions Code section 17203 allows a trial court to make such orders and judgments "as may be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of such unfair competition." The trial court should be given an opportunity to consider its discretion in light of our reversal to determine whether it can fashion an equitable remedy, if it finds in favor of Moore on the unfair competition law cause of action. (See, e.g., *ABC Internat. Traders, Inc. v. Matsushita Electric Corp.* (1997) 14 Cal.4th 1247, 1271 ["section 17203 authorizes a trial court to order restitution of money lost through acts of unfair competition"].)

V

*Motion For Costs And Attorney Fees*

The trial court granted Wells Fargo's motion for costs and attorney fees, awarding it $25,548.43 in costs and $312,197 in attorney fees, because Wells Fargo was the prevailing party at trial. Because we reverse the judgment on appeal, we reverse the costs and attorney fees ruling as well.

DISPOSITION

We reverse: (1) the amended final judgment in favor of Wells Fargo "on the Third Amended Complaint and all causes of action alleged therein" filed April 4, 2016; (2) the trial court's ruling on Moore's declaratory relief cause of action as set forth in the October 26, 2015 written decision titled, "Trial Court Ruling on Defendant's Motion For Judgment on the Pleadings and Rulings on Motions in Limine"; (3) the trial court's ruling on Moore's breach of the implied covenant of good faith and fair dealing as orally pronounced on November 12, 2015; (4) the trial court's ruling on Wells Fargo's motion

54

for judgment on the pleadings with regard to Moore's negligence cause of action as set forth in the October 26, 2015, written decision titled, "Trial Court Ruling on Defendant's Motion for Judgment on the Pleadings and Rulings on Motions in Limine"; (5) the trial court's ruling in favor of Wells Fargo on its motion for judgment notwithstanding the verdict as set forth in the February 18, 2016, written decision titled, "Trial Court Ruling Granting the Defendant's Motion for Judgment Not Withstanding [*sic*] the Jury Verdicts"; (6) the trial court's ruling in favor of Wells Fargo on the unfair competition law cause of action as set forth in the December 21, 2015, written decision titled, "Trial Court Ruling and Finding Re: Plaintiff's Seventh Cause of Action - Violation of Business and Professions Code [section] 17200; Entry of Judgment"; and (7) the trial court's ruling granting Wells Fargo's motion for costs and attorney fees as set forth in the August 23, 2018, written decision titled, "Trial Court Determination and Order Re: Costs and Attorney Fees."

The jury's verdict in favor of Moore on the intentional misrepresentation cause of action is reinstated. Moore shall recover his costs on appeal. (Cal. Rules of Court, rule 8.278(a)(1), (2).)


/s/
Robie, J.

We concur:


/s/
Raye,  P. J.


/s/
Duarte, J.

55